FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

03 SEP 26 PM 2: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY,

    **Plaintiff,**

v.

CHRISTOPHER FOSTER, et al.,

    **Defendants.**

]
]
]
]
]
]
]
]
]
]

CV-01-BE-3162-S

ENTERED *pc*

SEP 2 6 2003

### MEMORANDUM OPINION

### I. Introduction

This matter is before the court on the Motion for Summary Judgment filed by plaintiff

Nationwide Mutual Fire Insurance Company (Doc. 23).  The court has diversity jurisdiction of

this case pursuant to 28 U.S.C. § 1332.  Nationwide contends that it owes no duty to defend or to

indemnify its insured defendant Shirley Henson under either the automobile or homeowner's

policies issued to her for claims asserted by defendant Christopher Foster in the lawsuit styled

*Christopher Foster, as Administrator of the Estate of Gena Foster, Deceased v. Shirley Henson*

pending in the Circuit Court of Shelby County, Alabama.  The Foster complaint seeks damages

for the wrongful death of Gena Foster that resulted from a "road rage" incident.  The complaint

alleges that Mrs. Henson negligently or recklessly discharged her pistol, causing Mrs. Foster's

death.  Mrs. Henson has been convicted of manslaughter for the shooting death of Gena Foster.

The insured Shirley Henson did not file a separate response to the Motion for Summary

33

Judgment but adopted the memorandum filed on behalf of Christopher Foster.[1]

For the reasons stated below, the court finds that the Motion for Summary Judgment is due to be GRANTED.

## II. STATEMENT OF FACTS[2]

### A.    The Foster Complaint

The Foster Complaint alleges that "on November 8, 1999, near and about the interchange of Interstate 65 and Highway 31, in Alabaster, Shelby County, Alabama, Defendant Shirley Henson negligently or recklessly discharged her pistol, and caused the immediate death of Gena Foster." The complaint demands judgment and an award of punitive damages against Shirley Henson.[3]

### B.    The Automobile Insurance Policy

Nationwide issued a policy of automobile insurance to Shirley A. Henson that was in full force and effect at the time of Foster's death.  It provided for the following relevant coverage:

---

[1]The court notes that Mrs. Henson was represented by David Cromwell Johnson who died in January 2003.  However, Nationwide filed its Motion for Summary Judgment on July 1, 2002, and on August 1, 2002, Mr. Johnson filed a motion to adopt the memorandum filed by Foster. Thus, Mrs. Henson's presentation of her position in this case was not hindered by the subsequent death of her attorney.

[2]The facts set out in this Memorandum Opinion are gleaned from the briefs submitted by the parties regarding plaintiff's Motion for Summary Judgment and the court's own examination of the evidentiary record.  All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta,* 281 F.3d 1220, 1224 (11th Cir. 2002).  These are the "facts" for summary judgment purposes only.  They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F. 3d 1386, 1400 (11th Cir. 1994).

[3]Under Alabama's wrongful death statute, the plaintiff can only recover punitive damages.  See  Ala. Code § 6-5-410 (1993).

2

For payment of the premiums . . . , the Company agrees with the Policyholder named in the attached Declarations which are made a part hereof:

* * *

### C.  PROPERTY DAMAGE & BODILY INJURY - LIABILITY

To pay all sums which those entitled to protection become legally obligated to pay as damages arising out of the ownership, maintenance, or use, including loading and unloading, of the described automobile because of

* * *

(2)     bodily injury, sickness, disease, or death of any person . . . .

CONDITIONS
* * *

### 2.  POLICYHOLDER'S DUTIES[4]

The Policyholder or other person entitled to protection or someone on his behalf shall:
(a)     give the Company or its agent written notice of all accidents, occurrences, and losses as soon as practicable;

* * *

(c)     immediately deliver to the Company all papers in connection with any claims or suits;

* * *

(e)     assist the Company in all respects in connection with any claim or suit, . . .

* * *

### 8.  LIMITATIONS ON ACTIONS AGAINST AND OBLIGATIONS OF THE COMPANY

No action shall lie against the Company, under any of the coverages, unless, as a condition precedent thereto, there has been full compliance with all terms of this policy . . . .

---

[4] As modified by Endorsement 2276A.

3

**C.**     **The Homeowners' Insurance Policy**

Nationwide also issued a homeowner's insurance policy to Shirley A. Henson that was in

full force and effect at the time of the shooting.  It provided for the following relevant coverage:

### SECTION II - LIABILITY COVERAGES

**Coverage E  -- Personal Liability**

We will pay damages the **insured** is legally obligated to pay due to
an **occurrence**.
We will provide a defense at our expense by counsel of our choice.

\* \* \*

### SECTION II -- EXCLUSIONS

1.      **Coverage E -- Personal Liability** [does] not apply to
        **bodily injury**  . . .

        a.      caused intentionally by or at direction of an
                **insured**, including willful acts the result of
                which the **insured** knows or ought to know
                will follow from the **insured's** conduct.[5]

                                \* \* \*

        e.      arising out of the ownership, maintenance,
                or use of:
                                \* \* \*
                (2)      a motor vehicle owned or operated by, or
                rented or loaned to an **insured**.
                                \* \* \*

### SECTION II – CONDITIONS

                                \* \* \*

3.      **Duties after Loss.**  In case of an accident or **occurrence**,

_____

[5] Amendatory Endorsement 3191.

4

the **insured** will perform the following duties that apply. You will cooperate with us in seeing that these duties are performed:

    a.    Give notice to us or our agent as soon as practicable setting forth:

        (1)    identity of the policy and **insured**.
        (2)    the time, place, and facts of the accident or occurrence.
        (3)    names and addresses of the claimants and witnesses.

    b.    Forward to us every document relating to the accident or **occurrence**.

* * *

6.    **Suit against Us.**  No action can be brought against us unless there has been compliance with the policy provisions. . . .

**AMENDATORY ENDORSEMENT 3191**

It is agreed that the policy is amended as follows:

* * *

**DEFINITIONS**

* * *

In all policies, the definition of an occurrence is deleted and replaced by the following:  **Occurrence** means **bodily injury** or **property damage** resulting from an accident. . . .

D.    **The Shooting Incident**[6]

The shooting incident made the basis for the Foster complaint occurred on November 8, 1999, as a result of a "road rage" incident between two women traveling on Interstate 65 in

---

[6]The recitation of the facts relating to the shooting incident are gleaned primarily from Mrs. Henson's trial and deposition testimony.

Shelby County, Alabama.  Mrs. Henson first noticed the deceased Gina Foster's car when Mrs.

Foster slammed on her brakes in front of Mrs. Henson.  To avoid a collision, Mrs. Henson had to

slam on her brakes.  Mrs. Foster then continued to drive slowly.  Mrs. Henson saw an arm extend

out of a window of the Foster car.  Mrs. Henson turned on her bright lights and saw that the

driver was "shooting her a bird."

Mrs. Foster continued to drive slowly on the interstate.  Both Mrs. Henson and Mrs.

Foster were in the left lane, with Mrs. Henson traveling approximately two car lengths behind

Mrs. Foster.  Mrs. Foster pulled up next to a tractor trailer truck, which was in the right lane, then

drove at the same speed as the truck.  The truck activated its left turn signal, to move into the left

lane, so Mrs. Foster accelerated ahead of the truck.

Mrs. Henson also passed the truck, then activated her right turn signal to move into the

right lane.  Mrs. Foster braked hard.  Mrs. Henson had to brake also.  Two or three times Mrs.

Henson slowed to increase the distance between her and the other driver.  Mrs. Foster braked to

close the distance.

As the Alabaster exit approached, Mrs. Henson moved to the right lane.  Mrs. Foster

moved over also and braked hard.  Mrs. Henson applied her brakes.  Mrs. Foster extended her

arm out of the vehicle and waived something around.  Mrs. Henson turned on her bright lights

and saw what looked like a Coke bottle in the driver's hand.  Mrs. Foster then flipped the Coke

bottle back at Mrs. Henson.

Both vehicles got off the interstate at the Alabaster exit.  After exiting, Mrs. Foster came

to a stop in the right lane of the three exit lanes.  Mrs. Henson stopped behind her.  As soon as

Mrs. Foster stopped, Mrs. Henson saw Mrs. Foster's driver's door open, then a hand and a boot

6

come out.

When Mrs. Henson saw Mrs. Foster's door opening, she reached into the console

between the front seats of her vehicle and took out a pistol and laid it in her lap.  The loaded

pistol had a round in every chamber, was not in a holster, and did not have a safety.  She held the

gun in her right hand, in her lap.  She kept her right hand on the gun the entire time with her

finger on the trigger.  She thought she might have to use the pistol for self defense.

Consequently, she began preparing to protect herself.

Mrs. Henson looked up and saw Mrs. Foster standing at her open driver's window.  Mrs.

Foster was screaming and cursing.  Mrs. Henson did not know what Mrs. Foster was going to do.

Mrs. Henson thought Mrs. Foster was going to kill her.  Mrs. Foster's head came forward and she

spit at Mrs. Henson.

When Mrs. Foster started coming through the window, Mrs. Henson thought she was

going to die.  Mrs. Henson's own testimony summarizes how the shooting occurred:

> The best way I know to describe is if I were to lunge across this
> table at you and go at your face, would you try to protect yourself
> in some way?  And would you have time to go through your
> thought processes and what you were thinking and that you wanted
> to hurt me before I hurt you?  Or would you just try to protect
> yourself?  This is how quick this happened.  And I'm sorry I can't
> put words to it.  But it was the way I felt.  My life was in danger
> .....And I don't know what to tell you except I reacted.  I leaned
> back.  I tried to get away.  And the gun raised up and it went off.
> And I know it didn't go off by accident because it doesn't go off by
> accident....I didn't think about where I was shooting her.  I just
> knew she was coming in the window.  And I knew at that moment
> she was trying to kill me.[7]
> ....
> When she came to the window, I just reacted.  I didn't plan to kill

———————————————

[7]Plaintiff's Exhibit E, p. 77-78.

> the woman. I'm sorry that it happened. But I – when she lunged, I
> just reacted. And I know that the gun won't go off unless you pull
> the trigger. But I didn't consciously think to pull the trigger.
> When I jerked, the gun went off. And I know – I know I had to
> have pulled the trigger. But I don't remember thinking to do it.[8]

## E.   Notice to Nationwide

Mrs. Henson was convicted of manslaughter in the Circuit Court of Shelby County,

Alabama, on October 3, 2000. She was sentenced to thirteen years in prison and began serving

that sentence at the Julia Tutwiler Prison in Wetumpka, Alabama, on January 4, 2001. She did

not appeal the conviction.

The shooting incident, which is the basis of the Foster lawsuit, occurred on November 8,

1999. On November 17, 1999, Leila Watson, as attorney for the Foster family, sent a letter to

David Johnson, defense attorney for Shirley Henson, and advised him that she was making a

claim against Shirley Henson for the wrongful death of Gena Foster. She also sent a copy of the

letter to Mike Henson, Shirley Henson's husband. When Mike Henson received the letter, he

called his Nationwide Insurance agent, Russ Richardson, and told him that he had received the

letter and asked Mr. Richardson to call David Johnson, his wife's attorney. Mr. Richardson said

he would call David Johnson. Mr. Henson then delivered the letter by hand to Russ Richardson.

Mr. Henson let Russ Richardson, Nationwide, and David Johnson take care of the whole matter.

Nationwide acknowledges that its first notice of the claim was through its agent, Russ

Richardson, on November 30, 1999. On that date, Mr. Richardson filed formal claim reports on

the Hensons' Nationwide homeowners and automobile policies. Nationwide assigned claims

adjusters to the claims for investigation and handling. Nationwide called David Johnson and

---

[8]Defendant's Exhibit A, p. 85.

arranged to take a sworn statement from Shirley Henson at David Johnson's office months before the criminal trial in Shelby County.  On June 15, 2000, Eddie Elliott, attorney for Nationwide, took a sworn statement of Shirley Henson, and asked questions about the shooting incident. Nationwide admits that it had an opportunity to ask Shirley Henson questions about the shooting prior to the criminal trial, and that she answered the questions in a statement under oath.

The civil suit styled *Christopher Foster, as Administrator of the Estate of Gena Foster, Deceased v. Shirley Henson*, CV01-441, was filed on May 1, 2001 in the Circuit Court of Shelby County, Alabama  The complaint instructed the clerk's office to hold service because the attorney for the defendant would file an acceptance of service.  The court record further shows that the defendant's attorney David Johnson did file an acceptance of service on May 15, 2001.

Mrs. Henson testified that she first saw the summons and complaint at her deposition in this case on April 29, 2002.  According to the state court file, she was not served with that summons and complaint.  Instead, her lawyer accepted service for her.

Mr. Johnson, Shirley Henson, and Mike Henson all admit that they did not give notice of the filing of the lawsuit to Nationwide.  Mr. and Mrs. Henson did not even know that the lawsuit had been filed.  Mr. Johnson knew of the filing of the lawsuit, but, as he stated, he was "trying to deal with somebody's life, not a few shackles (sic)."[9]  Nationwide learned of the existence of the

---

[9]Immediately upon the conclusion of Shirley Henson's deposition testimony, Nationwide's attorney and Mrs. Henson's attorney had the following conversation that was tape recorded by the court reporter and transcribed.  (A certified copy of that transcript was submitted as Plaintiff's Exhibit "H."  Mrs. Henson was present when this conversation took place and made no objection or modification to it.)

"Mr. Elliott:     Are you going to contend that you notified us about the lawsuit and sent us the papers?

Mr. Johnson:     No, I'm not.  I f___'d that up, Eddie, okay?  That's – I'm not going to

civil lawsuit through its own investigation when one of its adjusters called the Shelby County

Circuit Clerk's Office on November 14, 2001 – seven months after the suit was filed.

### III. STANDARD FOR SUMMARY JUDGMENT

When a district court reviews a motion for summary judgment under Federal Rules of

Civil Procedure, it must determine two things: (1) whether any genuine issues of material fact

exist; and, if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56 (c).  To succeed, the moving party bears the burden of establishing both prongs of the

summary judgment test.  The nonmoving party may defeat the motion for summary judgment by

establishing either genuine issues of material fact or that the movant is not entitled to judgment

as a matter of law.

The moving party "always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The party seeking summary judgment can meet

this burden by offering evidence showing no dispute of material fact, or by showing that the

nonmoving party's evidence fails to meet some element of its case on which it bears the ultimate

burden of proof. *Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the

moving party support its motion with affidavits or other similar materials *negating* the

opponent's claim."  477 U.S. at 323.

---

contend it.  I've got some honor.  I've never contended it.  All I was doing
was trying to deal with somebody's life, not a few shackles [*sic*]."

10

When the moving party has supported its motion with evidence meeting its burden, Rule 56 (e) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P 56 (e)). The responding party does not need to present evidence in a form admissible at trial; "however, he may not merely rest on his pleadings." 477 U.S. at 324. "The plain language of Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In responding to a properly-supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).

Substantive law determines which facts are material and which are irrelevant. *Anderson*, 477 U.S. at 248. A dispute raises a genuine issue of fact "only if a reasonable jury considering the evidence presented could find for the nonmoving party." *Anderson*, 477 U.S. at 249. Material facts affect the outcome of the trial under governing law. 477 U.S. at 248. To determine whether a real question about a material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 249; *Patton*

11

*v. Triad Guar. Ins. Corp.*, 277 F.3d 1294, 1296 (11th Cir. 2002); *Witter v. Delta Airlines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998).

After both parties have addressed the motion for summary judgment, the court must grant the motion if no genuine issues of material fact exist and if the moving part is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which the jury could reasonably find for the nonmovant. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1998). The court should not weigh the evidence, or make determinations as to the credibility of witnesses because these decisions fall to the provence of the jury. *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Thus, "the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "The nonmovant need not be given the benefit of every inference but only of every reasonable inference." *Graham*, 193 F.3d at1282 (quoting *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n. 12 (11th Cir. 1988).

## IV. DISCUSSION

Nationwide contends that it owes no coverage under either the automobile policy or the homeowner's policy issued to the Hensons on two separate theories. First, Nationwide argues that the Hensons violated a condition precedent to coverage under both policies by failing to provide it with notice of the lawsuit. Second, Nationwide asserts that the Foster lawsuit falls outside the scope of coverage of both policies or is excluded from coverage because the

12

underlying incident was not an accident.

### A.    Homeowners or Automobile Policy?

Before addressing whether the insureds complied with the notice conditions, or whether the incident falls within the scope of coverage or is excluded, the court must first ascertain which insurance policy applies to this incident. An automobile insurance policy and a homeowners policy generally provide mutually exclusive coverage, so both policies cannot apply to the same incident.  By its terms, an automobile policy provides liability coverage only for "damages arising out of the ownership, maintenance, or use. . ." of the insured automobile. On the other hand, the homeowners policy specifically <u>excludes</u> coverage for liability "arising out of the ownership, maintenance, or use" of an automobile owned or operated by the insured.  Given the nature of these policies, they cannot both apply in this case.  So the first question this court must answer is whether the damages asserted in the Foster suit "arise out of the ownership, maintenance, or use" of the insured automobile driven by Mrs. Henson on November 8, 1999, when she shot and killed Gena Foster.  For the following reasons, the court concludes that the shooting of Gena Foster did <u>not</u> arise from the ownership, maintenance, or use of the automobile, and therefore, Nationwide owes no coverage or duty to defend under the automobile policy.

The "arising out of the . . . use" phrase contemplates some sequential relationship or connection between the use of the automobile and the loss.  How close the loss must be to the normal and expected use of a vehicle has been the subject of much litigation.

The phenomena of "road rage" has resulted in an increasing number of cases interpreting the scope of an automobile policy in situations similar to this case.  Under Alabama law, in the context of a shooting, the "arising out of" the "use" an automobile requirement mandates that

some "causal connection" be found "between the discharge of the gun and the inherent use of the vehicle." *Taliaferro v. Progressive Speciality Ins. Co.*, 821 So. 2d 976, 978 (Ala. 2001).

Courts have recognized four basic categories of cases involving shootings and the interpretation of "arising out of the ownership, maintenance, or use" of a vehicle provision: (1) the mere situs cases; (2) gun rest cases; (3) gun rack cases; and (4) loading and unloading the vehicle cases. *Taliaferro*, 821 So. 2d at 978-980. "Mere situs" cases are those in which the vehicle provides only the location from which a shooting occurs. Cases "involving an assault with a weapon--whether or not a firearm--occurring in or around an automobile" constitute mere situs cases. *Taliaferro*, 821 So. 2d at 979. No causal connection lies between the discharge of the gun and the inherent use of the automobile. Thus, mere situs cases do not arise from the ownership, maintenance or use of the automobile and, therefore, no coverage exists for these cases under an automobile policy. *Taliaferro*, 821 So. 2d at 979.

The *Taliaferro* decision discussed three prior Alabama cases involving assaults that fell into the "mere situs" category of non-coverage: *Allstate Ins. Co. v. Skelton*, 675 So. 2d 377 (Ala. 1996) (roadside altercation after erratic driving); *United States Fid. & Guar. Co. v. Lehman*, 579 So. 2d 585 (Ala. 1990) (car salesman stabbed by customer while customer driving); and *Rich v. Colonial Ins. Co. of California*, 709 So. 2d 487 (Ala. Civ. App. 1997) (insured shot in attempted car-jacking while stopped at traffic light). The *Allstate v. Skelton* case is particularly instructive.

The facts of the *Allstate v. Skelton* case involved a roadside fight between the driver of one vehicle, Skelton, and the passenger of another, Wright. Before the fight, the Wright vehicle had been involved in dangerous, reckless, and high speed driving maneuvers with a third vehicle driven by Mixon. In these maneuvers, the Wright vehicle had abruptly slowed and sped up,

14

passed the Mixon vehicle on the left shoulder of the highway, and eventually forced the Mixon vehicle off the road.   After the Wright vehicle forced Mixon off the road, Wright got out, brandished a pistol at Mixon, shouted obscenities at her, pointed the pistol at her, and broke her windshield with the pistol.  Skelton had been traveling with Mixon, following behind her. When Skelton stopped to assist Mixon, Wright struck Skelton in the head with the pistol.  675 So. 2d at 379.

Skelton sued his uninsured motorist carrier, claiming that his injuries "arose out of the ownership, maintenance, or use of an uninsured auto," the Wright vehicle.  675 So. 2d at 379. The Alabama Supreme Court held that Skelton's injuries did not arise out of the ownership, maintenance, or use of the vehicle because

> Wright's battery on Skelton was an intervening act that broke the causal connection between the use of the Wright automobile and the injury.  A criminal act, such as the battery in this case, will break the causal chain because no reasonable standard would suggest that an automobile insurer intended to insure against such acts.  When an insurance company writes an automobile policy, it covers foreseeable risks associated with the use of the covered automobile.  Dell Wright's battery of Skelton was not a foreseeable risk associated with motoring.

*Skelton*, 675 So. 2d at 380 (emphasis added).

Thus, the Alabama Supreme Court in *Allstate v. Skelton* held that where the injuries result from a criminal act, that criminal act breaks any causal connection between the intended use of the vehicle and those injuries.  Like the assailant in *Skelton*, Mrs. Henson has been found guilty of criminal conduct in the shooting death of Mrs. Foster.  Like the assailant's conduct in *Skelton*, no causal connection exists between Mrs. Henson's use of the vehicle and the death of Gina Foster.  The Henson vehicle was merely the "situs" of the shooting.

15

That the Foster shooting was preceded by "combative" driving between Mrs. Foster and

Mrs. Henson on the interstate provides no significance.  The *Skelton* decision makes clear that a

shooting does not arise out of the ownership, maintenance, or use of a vehicle simply because it

follows or results from certain driving behavior. As the Alabama court noted, "the mere fact that

the use of the vehicle preceded the harm which was later sustained is not sufficient to bring such

harm within the coverage of the policy." *Skelton*, 675 So. 2d at 382, quoting *Couch on*

*Insurance 2d* §45:57 (rev. ed. 1981).[10]

---

[10]The *Skelton* Court noted with approval that numerous courts had applied this rule to
find no coverage under the automobile insurance policy in the following cases:

> California: a stabbing of a motorist who followed the insured five miles to complain
> about a lane change was not covered, *United Services Auto. Assoc. v. Ledger*, 189 Cal.
> App.3d 779, 234 Cal. Rptr. 570 (1987);
> Florida: a shooting after a rear end accident at a stop light was not covered, *Race v.
> Nationwide Mut. Fire Ins. Co.*, 542 So. 2d 347 (Fla. 1989);
> Florida: a shooting after a lane change and obscene gestures was not covered, *Northern
> Ins. Co. v. Hampton*, 510 So. 2d 649 (Fla. Dist. Ct. App.), *review denied*, 518 So.2d 1275
> (Fla. 1987);
> Florida: a shooting after a near collision was not covered, *Fowler v. State Farm Mut.
> Auto. Ins. Co.*, 548 So. 2d 830 (Fla. Dist. Ct. App. 1989);
> Florida: a shooting after a rear-end accident was not covered, *Rustin v. State Farm Mut.
> Auto Ins. Co.*, 254 Fla. 494, 330 S.E. 2d 356 (1985);
> Minnesota: a fistfight following an argument at a stop light was not covered, *Wieneke v.
> Home Mut. Ins. Co.*, 397 N.W.2d 597 (Minn. App. 1986);
> New Jersey: a stabbing following a sideswiping incident was not covered, *Foss v.
> Cignarella*, 196 N.J. Super. 378, 482 A.2d 954 (1984);
> Oklahoma: a fight after an accident was not covered, *Stuckey v. Long*, 783 P.2d 500
> (Okla. App. 1989);
> Pennsylvania: a fight after an accident was not covered, *Cummings v. State Farm Mut.
> Auto Ins. Co.*, 408 Pa. Super. 381, 596 A.2d 1138 (1991);

> Ninth Circuit Court of Appeals: a stabbing after a driver failed to dim his headlights was
> not covered, *State Farm Mut. Auto. Ins. Co. v. Fernandez*, 767 F.2d 1299 (9th Cir. 1985).

*Allstate v. Skelton*, 675 So. 2d at 380-382.

16

In response to Nationwide's argument, Mr. Foster asserts that the shooting was the result of "what started on the highway." He cites no authority, however, for his position that the automobile policy provides coverage merely because the shooting had its genesis in the driving maneuvers of the women.  Indeed, the Alabama Supreme Court in *Skelton*, and the courts in other cases addressing the issue, rejected similar arguments.

The ownership, maintenance, or use of the insured automobile by Mrs. Henson on the fateful night did no more than create the "atmosphere of hostility" that bred fear and resulted in the shooting death of Mrs. Foster. *See Race v. Nationwide Mut. Fire Ins. Co.,* 542 So. 2d 347, 351 (Fla. 1989). The creation of an atmosphere of hostility does not establish a causal connection between the inherent use of the vehicle and the discharge of the gun.  Given the above-cited authorities, no coverage arises under the automobile liability policy.

Although the automobile and homeowner's policies are generally mutually exclusive of each other, finding that the incident falls outside the scope of the automobile policy does not automatically mean that coverage exists under the homeowner's policy.  Nationwide cannot, however, avail itself of the exclusion in the homeowner's policy of liability arising from the ownership, maintenance, or use of an automobile to deny coverage under the homeowner's policy because the same analysis applies to both the "arising out of the . . . use" coverage provision in the automobile policy and exclusion in the homeowner's policy.  The Foster claim did not arise out of the use of the Henson vehicle; thus the homeowner's policy may provide coverage.

––––––––––––––––––––

17

Coverage exists under the homeowner's policy <u>if</u> the claim falls within the scope of coverage, is not eliminated by any exclusion, and the insured has met the conditions precedent for coverage.  Nationwide contends that coverage does not lie under the scope of the homeowner's policy because the shooting incident was not an occurrence, i.e., not an accident, and alternatively that coverage is excluded by the willful acts exclusion.  Before reaching these coverage questions, however, Nationwide has raised a policy defense that the court must address.

**B.     Notice: A Condition Precedent to Coverage**

Nationwide argues that neither Mrs. Henson nor anyone on her behalf complied with the condition precedent to coverage by giving it notice of the lawsuit.  The parties do not dispute the fact that no one forwarded suit papers to Nationwide.  The insurance policy obligates an insured to give notice to the insurance company of an accident and also to give notice of a lawsuit.  The notice provision of the homeowner's policy requires that the insured provide notice to the insurer as soon as practicable of an accident or occurrence.  No one disputes that the insured notified Nationwide of the incident and forwarded to it the letter from Foster's attorney advising of the intent to file a wrongful death claim.  But notice of the incident does not relieve the insured of other obligations, including the obligation to forward to the insurer any suit papers.

The insured also bears the obligation to "forward to [Nationwide] every document relating to the accident or occurrence."  Thus, the insured must give notice to the insurer of not only the accident, as the Hensons did here, but also forward the suit papers, which they did not do.

Compliance with such a notice provision in an insurance policy presents  a condition precedent to coverage under the policy. *American Fire & Cas. v. Tankersley*, 116 So. 2d 579,

18

582 (Ala. 1959). An insured's failure to comply with this requirement relieves the insurer of liability under the policy. *Watts v. Preferred Risk Mut. Ins. Co.*, 423 So. 2d 171, 173 (Ala. 1982). Under Alabama law, an insurer need not show prejudice from the lack of notice to be relieved of any obligation under the policy. *Tankersley*, 116 So. 2d at 581.

Mr. Foster does not argue that the Hensons provided notice to Nationwide of the lawsuit filed against Mrs. Henson. Instead, he argues that the express language of the homeowners policy only obligates the insured – not anyone acting on the behalf of the insured – to deliver all papers to Nationwide. Thus, he argues, because the Hensons never received the lawsuit personally, they are relieved of any obligation to forward the suit. Mr. Foster cites no supporting authority for the argument that acceptance of service by Mrs. Henson's attorney somehow negates the responsibility of the insured to see that the suit papers are sent to the insurer.

Mr. Foster does argue that Nationwide could have provided in the homeowners policy, as it did in the automobile policy notice provision, that someone on the insured's behalf shall deliver any suit papers to the company, and that the policy as written does not require notice of the lawsuit to be sent to Nationwide when suit was not received personally by the insured. Mr. Foster asserts that the policy does not require that a copy of the lawsuit be delivered to Nationwide. However, the plain language of the policy requires the insured to forward to Nationwide "every document relating to the accident or occurrence." Perhaps the most critical document relating to an accident is the lawsuit filed as a result.

The position that Mr. Foster would have this court adopt invites fraud and collusion

between the insured and the claimant.[11]  If service of a suit on the insured's attorney relieves the

insured of any obligation to pass that suit onto the insurer as a matter of law, the claimant could

serve the attorney, take a default judgment, and the insurance company would be unable to rely

on the notice requirement because the insured never personally received the lawsuit.  The

purpose of requiring notice of a lawsuit is to provide the liability insurer, who has a duty to

defend, the opportunity to adequately investigate, defend the case, and control the litigation.  *See*

*Preferred Risk Mut. Ins. Co.,* 423 So. 2d at 173.  Circumventing the requirement of forwarding

the lawsuit to the insurer by service on the attorney and not the insured defeats that purpose and

borders on an absurd construction of the policy language.  Further, the policy clearly requires that

the "insured cooperate with [Nationwide] in seeing that these duties are performed."  This

language in the policy does not relieve the insured of the obligation to forward suit papers to the

insurance company merely because the papers were served on the attorney and not on the insured

directly.  Although the Hensons were not relieved of the duty to forward suit papers to the

insurer, the question still remains whether the failure to deliver constituted a breach of the

condition precedent.

Mr. Foster, in reply to Nationwide's Motion for Summary Judgment, focused on

Nationwide's knowledge of the wrongful death claim against its insured, the investigation it

conducted of the accident, and the steps it took and failed to take in checking to see if suit had

been filed.  This argument sounds like an argument that either Nationwide had the duty to

discover for itself whether suit had been filed, or that Nationwide was not prejudiced by the

---

[11]In expressing concern that this position could invite fraud and collusion, the court does not suggest that such were present in this case.  To the contrary, nothing suggests that Mr. Johnson's failure to notify Nationwide was anything more than an oversight on his part.

delay.  Neither argument has merit.

The insurance policy, which establishes the contractual obligations between the insurer and the insured, squarely places the responsibility on the <u>insured</u> to notify the insurance company of any lawsuit – not the other way around.  Placing the obligation on the insured to notify the company of a lawsuit finds support in the logical notion that the insured – or the insured's attorney – will be served with the summons and complaint.  The policy logically places upon the insured, as the recipient of the suit papers, the obligation to forward those papers to the insurance company.  The mere fact that Nationwide could – and eventually did – perform its own investigation into whether suit was filed does not relieve the Hensons of the contractual obligation to deliver the suit documents to Nationwide.  Indeed, an insured must comply with the notice provisions and cannot avoid that obligation based on information the insurer may have received from other sources.  *See Reeves v. State Farm Fire & Cas. Co.*, 539 So. 2d 252, 254 (Ala. 1989).

That Nationwide may not have been prejudiced by the delay likewise does not shift the focus from the Hensons' failure to give notice.  Alabama law has long held that prejudice to an insurer is irrelevant in determining whether an insured's delay breached the contract.  *See Southern Guar. Ins. Co. v. Thomas*, 334 So. 2d 879, 883 (Ala. 1976); *Tankersley*, 116 So. 2d at 581; *See Also, United States Fed. & Guar. Co. v. Baldwin County Home Builders*, 770 So. 2d 72, 75 (Ala. 2001).  In most cases involving the condition precedent of notice of an occurrence or a lawsuit, the courts focus on whether the insured gave notice within a reasonable time in light of the circumstances.  *See Big Three Motors, Inc. v. Employers Ins. Co. of Ala.*, 449 So. 2d 1232, 1235 (Ala. 1984); *Liberty Mut. Ins. Co. v. Roberts & Co.*, 357 So. 2d 968, 970 (Ala. 1970).  Only

21

the length of the delay and the reasons for the delay play a material role in determining whether the insured breached the condition precedent to coverage. *See Big Three Motors*, 449 So. 2d at 1235. Although this case involves a complete failure by the insured to deliver the suit papers, not a mere delay, very few Alabama cases have addressed an outright failure to provide notice. The court, however, concludes that the same analysis the Alabama courts apply to late notice cases should also apply to this case involving failure to deliver suit papers. That is, the court must examine the length of the delay and the reasons for the delay or failure to determine whether the insured breached the condition precedent for coverage.

As previously stated, no party disputes that the Hensons gave Nationwide notice of the incident. Likewise, no one disputes that neither the Hensons nor their lawyer forwarded the suit papers to Nationwide as required by the policy. Nationwide, through its own investigation, learned of the lawsuit against its insureds seven months after it was filed. Although the Hensons never did provide notice of the suit to Nationwide, for purposes of this analysis, the court will use the seven-month delay between filing of suit and Nationwide learning of the suit as the length of the delay. The court must determine whether the seven-month delay was reasonable under the circumstance.

The determination of whether the insured breached the notice condition turns on the reasonableness of the delay under the circumstances. *Big Three Motors*, 449 So. 2d at 1235. Because the Hensons through their deposition testimony and that of their attorney presented an excuse for their failure to forward the suit papers, the question becomes whether the excuse they offered was reasonable in light of the circumstances.

As the Alabama Supreme Court has stated:

22

> If conflicting inferences can be drawn from the evidence, the
> question of reasonableness is submitted to the trier of fact.  If the
> facts are undisputed, however, <u>and the insured does not show</u>
> <u>justification for the protracted delay</u>, the court may find the delay
> unreasonable as a matter of law.  *Thomas*, 334 So. 2d at 883;
> *Bonitz* Insulation, 424 So. 2d at 572-73.

*Baldwin County Home Builders Assoc.*, 770 So. 2d. at 75.  (emphasis added).  In this case,

although the facts are undisputed, the insureds have offered justification for their failure to

provide Nationwide with copies of the lawsuit: neither Mr. nor Mrs. Henson knew the lawsuit

had been filed.  Indeed, Mrs. Henson was in prison when the civil suit was filed.  Neither Mr. nor

Mrs. Henson were served with the complaint.  The court cannot say that their failure to deliver to

Nationwide copies of the lawsuit that they had not received and about which they had no

knowledge was unreasonable as a matter of law.

The inquiry, however, does not stop with an examination of Mr. and Mrs. Hensons'

failure; the court must also examine the actions of their attorney.  No one disputes that the

Hensons' attorney Mr. Johnson accepted service of the civil suit on their behalf.  Similarly, no

one disputes that Mr. Johnson failed to provide Nationwide with a copy of the suit or even notice

of its filing.  Mr. Henson testified that he was relying on Mr. Johnson and Nationwide to handle

everything.  Mrs. Henson likewise testified that she authorized her attorney to handle "anything

that came up" while she was in prison.  The question then becomes whether the Hensons acted

reasonably in relying upon their attorney to handle matters.

The court has expressed concern that holding as a matter of law that service of a

complaint on the insured's attorney relieves the insured of the obligation to forward suit papers to

the insurance company.  See fn 11.  However, the court cannot hold as a matter of law that the

Hensons acted unreasonably when they relied upon their attorney to take care of matters for them. Nationwide has offered no evidence to support a finding that their reliance was unreasonable; similarly, Nationwide has not cited to any case holding that a delay (or failure) in giving notice because the insured did not know of a lawsuit was unreasonable or violative of the notice condition. Further, Alabama courts have excused delays of even longer than seven months, finding them reasonable in light of the circumstances, and thus, not violative of the notice provision. *See e.g., Baldwin County Home Bldrs. Assoc.*, 770 So. 2d at 76 (reversing summary judgment for the insurer because the insured offered "mitigating circumstances, leading to conflicting inferences concerning the reasonableness of the delay.") *appeal after remand*, 823 So. 2d 637 (Ala. 2001); *Am. States Ins. Co. v. Barker*, 438 So. 2d 748, 750 (Ala. 1983) (three-year delay excused because insured had never actually received summons and complaint for potential damages suit); *United States Fed. & Guar. Co. v. Bonitz Insulation Co.*, 424 So. 2d 569, 573 (Ala. 1982) (five-year delay in giving notice of an occurrence reasonable where contractor believed subcontractor was remedying the problem); *American Liberty Ins. Co. v. Soules*, 258 So. 2d 872, 881 (Ala. 1972) (eleven-month delay excused because insured was unaware of the policy). The court, thus, concludes that Nationwide is not entitled to judgment as a matter of law on the breach of notice condition.

## C.   Duty to Defend or Indemnify?

Nationwide argues that it owes no duty to defend or to indemnify because Mrs. Fosters' death was not an "occurrence" and, therefore, not within the scope of coverage. Alabama law provides clear rules of construction of an insurance policy. Generally, insurance contracts should be liberally construed in favor of coverage for the insured and construed strictly against the

insurance company who drafted the contract. *Skelton*, 675 So. 2d at 379. Exclusions that negate

coverage should be interpreted as narrowly as possible to provide maximum coverage, and

should be construed against the company that drafted and issued the policy. *Skelton*, 675 So. 2d

at 379 - 380; *St. Paul Fire & Marine Ins. Co. v. Molton, Allen & Williams Corp.*, 592 So. 2d 199,

201 (Ala. 1991). If a policy provision contains an ambiguity, the provision must be construed in

favor of the insured; however, courts must enforce unambiguous policies as they are written.

*Gardner v. Cumis Ins. Soc. Inc.,* 582 So. 2d 1094, 1096 (Ala. 1991). In applying these rules of

construction, however, the court should not create a new contract for the parties by ignoring

express terms of the policy, including exclusionary clauses, in the absence of public policy

considerations that mandate a different result. *Gardner*, 582 So. 2d at 1096.

1.      Scope of Coverage: Occurrence?

        The homeowners policy provides liability coverage for "damages the insured is legally

obligated to pay due to an occurrence." To fall within the scope of coverage, the incident made

the basis of the Foster suit must be an occurrence. An amendatory endorsement defines

"occurrence" as "bodily injury or property damage resulting from an accident." The policy does

not define "accident."

        According to the Alabama Supreme Court, "the term `accident' has been variously

defined as something unforeseen, unexpected, or unusual." *Bonitz Insulation*, 424 So. 2d at 572.

The *Bonitz* decision drew its definition from a previous Alabama case, *Employers Ins. Co. of*

*Alabama v. Rives*, 264 Ala. 310 (1955), which provided the following additional general

language as to the definition of accident:

                the word has been defined as a fortuitous circumstance,

25

> preventable, and not prevented; an unexpected or unforeseen event
> happening with or without human fault.
>
> As defined by some courts, the word 'accident' means happening
> by chance or not as expected.

*Employers Ins. Co.*, 264 Ala. at 312-313. This understanding of "accident" embraces the concept

of fortuitous loss that lies at the heart of insurance coverage. See Robert H. Jerry, III,

*Understanding Insurance Law* §§ 65 [b], 63 (2d ed. Matthew Bender 1996).

While these general statements provide some guidance, the analysis has always turned on

a case-by-case consideration of the facts. The Alabama cases dealing with the question of

whether an incident qualifies as an accident lend little guidance because the language used in the

Nationwide policy is unique. This policy provision is unique because the words "occurrence"

and "accident" are used in the insuring provision without the phrase ". . . neither expected, nor

intended, from the standpoint of the insured." The distinction is significant because this

language, either in the insuring provisions or in the exclusions, generally results in a subjective

test of the insured's intentions or expectations. A subjective test cannot be applied to this policy,

because the expected or intended injury exclusion in this policy requires an objective test, not a

subjective one.

Although Nationwide cites no cases interpreting its provision, the plain language of the

policy does not require a subjective standard to determine whether the shooting of Mrs. Foster

was an accident because the policy does not limit that definition to bodily injury "expected or

intended from the standpoint of the insured" as do many other policies.[12]

---

[12]*Cf., James v. State Farm Fire & Cas. Co.,* 405 So. 2d 712, 713 (Ala. App. 1981). That
policy defined "occurrence" as "an accident . . . which results in bodily injury . . . neither
expected nor intended from the standpoint of the insured. . . ." *Id.* Applying a subjective

26

The court must determine, as a matter of law, whether Mrs. Foster's death was "something unforeseen, unexpected or unusual," *Bonitz*, 424 So. 2d at 572, or a "happening by chance," *Rives*, 264 Ala. at 312-13. The parties agree that this definition of accident controls. The parties have no material dispute regarding the facts leading up to the shooting. Whether those facts support a conclusion that the shooting was not an accident, however, is vehemently disputed.

Under Alabama law, the burden of establishing coverage rests upon the insured to demonstrate that a claim falls within the scope of coverage. *Colonial Life & Accident Ins. Co. v. Collins*, 194 So. 2d 532, 535 (Ala. 1967). Therefore, to invoke coverage, the Hensons must present substantive evidence that Mrs. Foster's death was an accident. Even interpreting the term "accident" in its broadest sense, the undisputed facts in this case do not support even an inference that Mrs. Henson's actions in shooting Mrs. Foster were unforseen, unexpected or unusual. Her own testimony confirms that she deliberately retrieved a loaded gun, pointed the loaded gun at Mrs. Foster whom she believed to be an assailant, and pulled the trigger. Mrs. Henson as much as acknowledged that the shooting was not an accident when she stated: "And I know it [the gun] didn't go off by accident because it doesn't go off by accident. . ." Whether she intended to harm Mrs. Foster or even whether she intentionally pulled the trigger is irrelevant. She took deliberate preparatory steps that resulted in the shooting death of Mrs. Foster. The bodily injury that resulted from these deliberate actions was not unforeseen, unexpected or unusual and therefore

_____

standard, the court found that the insured's testimony that she did not intend the injury created an issue of fact for the jury. *Id.* at 714. *Cf. Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc.*, 990 F. 2d 598, 603 (11th Cir. 1993) applying a subjective standard to a definition of "occurrence" that limited coverage to injury "neither intended nor expected" by the insured.

27

not an accident.  Therefore, the shooting death of Mrs. Foster does not fall within the scope of coverage of the Nationwide policy.

2. Exclusion: Intentional Injury?

Even if the court is wrong and the shooting incident fell within the scope of coverage, Nationwide still would be entitled to summary judgment based on the willful acts exclusion. That exclusion reads:  "Coverage E  – Personal Liability . . . do[es] not apply to bodily injury. . . caused intentionally by or at [the] direction of an insured, including **willful acts the result of which the insured knows or ought to know will follow from the insured's conduct**" (emphasis added).  The phrase "ought to know will follow" means that an objective test governs the application of this exclusion, rather than a subjective one.  The Alabama cases applying a "subjective test" to the interpretation of an "intentional injury" exclusion are not applicable because the provision in those cases excluded coverage for injuries "expected or intended from the standpoint of the insured." *See e.g., Alabama Farm Bureau Mut. Cas. Ins. Co. v. Dyer*, 454 So. 2d 921, 922, 925 (Ala. 1984).

No Alabama decision has interpreted willful acts exclusion such as this one.  Those jurisdictions that have considered it have applied an objective standard.  *See, e.g., Nationwide Mut. Ins. Co. v. Finkley*, 679 N.E. 2d 1189 (1996).  In that case, the court held that the exclusion applied where "any reasonable person would know, or should know, that such actions would probably lead to serious injury." *Finkley*, 679 N.E. 2d at 1191.

The Alabama Supreme Court has acknowledged that "insurance companies have the right to limit coverage offered through the use of exclusions in their policies, provided that those exclusions do not violate a statute or public policy."  *Hooper v. Allstate Ins. Co.,* 571 So. 2d

28

1001, 1002 (Ala. 1990) (citations omitted).  If the policy contains an unambiguous exclusion that does not violate a statute or public policy, the court should enforce the policy as written. *Gardner*, 582 So. 2d at 1096; *Hooper*, 571 So. 2d at 1002; *Johnson v. Allstate Ins. Co.*, 505 So. 2d 362, 365 (Ala.1987).  Exclusionary clauses, such as the one at issue in this case, prevent the indemnification of a wrongdoer and do not violate public policy.  *See, Gardner*, 582 So. 2d at 1096; *Hooper*, 571 So. 2d at 1003 ("No public policy considerations dictate that an insurer must indemnify a third party for the criminal acts of an insured."  Exclusion specifically addressed "criminal acts.")

Applying the language of the exclusion to the insured's testimony about the events leading up to Mrs. Foster's death leads to only one conclusion:  Mrs. Henson knew or ought to have known that picking up a loaded gun without a safety, pointing it at a person perceived to be an aggressor, and pulling the trigger would result in serious injury or death to the person standing at the car window only a few feet away from the gun.  Mrs. Henson's testimony that she did not plan to kill the woman or she did not think about pulling the trigger does not save her actions from the exclusion of coverage.  Particularly under the objective standard applicable to the Nationwide policy language, a reasonable person would know that pointing a loaded gun at a person a few feet away in a heated situation would probably lead to serious injury.

Counsel for Mr. Foster cites *Allstate Indemnity Co. v. Lewis*, 985 F. Supp. 1341 (M.D. Ala. 1997) (applying Alabama law) as an example of application of an objective standard.  The exclusion at issue in that case contained both an objective and a subjective component: the exclusion applied to injury "which may reasonably be expected to result from" the intentional or criminal acts of the insured or to injury "which is in fact intended by the insured."  985 F. Supp.

at 1347.  Similarly, the Nationwide policy excludes bodily injury caused intentionally by the insured including "willful acts the result of which the insured knows or ought to know will follow from the insured's conduct."  This second phrase is akin to the "reasonably be expected to result" portion of the exclusion in *Lewis*.

Counsel for Mr. Foster then focuses on language from the *Lewis* decision discussing the requirements of intent.  If the focus here were on the first part of the Nationwide exclusion – bodily injured caused intentionally – counsel's argument might carry more weight.  However, intent to cause harm is not key when the focus shifts to whether the insured engaged in "willful acts the result of which the insured knows or ought to know will follow from the insured's conduct."  Under this prong, the focus is not on whether Mrs. Henson intended harm, but whether she should have known that harm would likely follow her willful acts.

The court agrees with Judge Thompson in *Lewis*: "because the 'expected to result from the intentional acts' terminology is not qualified by the phrase 'by the insured,' it makes no difference whether the insured expected to commit the act or to cause the harm."  985 F. Supp. at 1347.  The court further agrees that even under an objective standard the "exclusion does not extend to negligent or reckless acts."  985 F. Supp. at 1347.

The actions of Mrs. Henson, however, were not merely negligent or reckless acts.  Mrs. Henson contended in her criminal trial that she shot Mrs. Foster in self-defense.  Even assuming she did not have the specific intent to kill Mrs. Foster, she has consistently testified that she intentionally took the loaded gun from the console and held it in her right hand with her finger on the trigger in preparation of using the gun to defend herself.  She was in a heated situation and added to the volatility of that situation by arming herself with a loaded gun.  Mrs. Henson

30

testified at her criminal trial that she had been taught self-defense by a police officer and was

trained in the use of her pistol.  Such training brings with it a knowledge that holding a loaded

gun, without a safety, with a finger on the trigger and pointing it in the direction of another

person can result in the discharge of the gun whether the person holding the gun actually intends

to discharge it, and that injury can result.  The court finds that these kind of willful acts are

precisely the kind where the insured should know that such acts will likely result in injury.

The facts in this case surrounding the terrible shooting are undisputed.  They all come

from Mrs. Henson's own testimony.  She is the only living eyewitness to the horrific event.

Examining these undisputed facts and the reasonable inferences from them in the light most

favorable to the non-moving parties does not defeat summary judgment in this case.  No

reasonable person could conclude that Mrs. Foster's death was not the result of Mrs. Henson's

willful acts of arming herself with a loaded gun and pointing it at Mrs. Foster.  No reasonable

person could conclude that Mrs. Henson's willful acts were not likely to result in bodily injury.

Therefore, Nationwide would be entitle to summary judgment that the intentional injury

exclusion precludes coverage if the shooting incident somehow had been an occurrence so as to

trigger coverage under the policy.

Although Nationwide seeks to be relieved of its duty to defend, as well as its duty to

indemnify, it fails to address the standard this court must apply to determine that duty.  Under

Alabama law, the language of the insurance policy and the allegations of the complaint filed

against the insured generally determine the duty of the insurance company to defend its insured.

*See Alfa Mut. Ins. Co. v. Morrison*, 613 So. 2d 381, 382 (Ala. 1993); *United States Fid. & Guar.*

*Co. v. Armstrong*, 479 So. 2d 1164, 1168 (Ala. 1985); *Ladner & Co. v. Southern Guar. Ins. Co.*

347 So. 2d 100, 102 (Ala. 1977).  The duty to defend, however, need not be determined solely from the bare allegations of the complaint.  *Ladner,* 347 So. 2d at 103.  "If there is any uncertainty as to whether the complaint alleges facts that would invoke the duty to defend, the insurer must investigate the facts surrounding the incident that gave rise to the complaint in order to determine whether it has a duty to defend the insured."  *Blackburn v. Fidelity & Deposit Co. fo Maryland,* 667 So. 2d 661, 668 (Ala. 1995); *Pacific Indem. Co. v. Run-A-Ford Co.,* 161 So. 2d 789, 795 (Ala. 1964).

The Foster complaint alleges that Mrs. Henson "negligently or recklessly discharged her pistol."  In certain circumstances, however, the facts of the underlying accident, not the legal theories in clever pleading, control the duties of an insurer under an insurance policy.  *See, e.g., St Paul Mercury Ins. Co. v. Chilton-Shelby Mental Health Ctr.,* 595 So. 2d 1375, 1377 (Ala. 1992); *Alfa Mut. Ins. Co. v. Jones*, 555 So. 2d 77, 78 (Ala. 1989); *Cooter v. State Farm Fire & Cas. Co.,* 344 So. 2d 496, 499 (Ala. 1977); see also *Atlantic Mut. Fire Ins. Co. of Savannah v. Cook*, 619 F.2d 553, 555 (5th Cir. 1980) (applying Alabama law) (rejecting the argument that the insurer had a duty to defend based on the allegations of the complaint when the underlying facts showed that the suit was not covered).  Also, when a court determines that an insurance policy does not cover the underlying incident, the insurer has no duty to defend.  *See, e.g., Ladner*, 347 So. 2d at 102-03.  Because the shooting of Mrs. Foster was not an accident and thus outside of coverage or, alternatively, was excluded from coverage, Nationwide owes no duty to defend the Foster Complaint.

## V.  CONCLUSION

In summary, the court concludes as follows:  (1) no coverage exists under the automobile

32

policy because the shooting incident did not arise out of the use of the insured automobile; (2) a

question of fact exists as to whether the excuse given by the insured for failure to notify

Nationwide of the lawsuit makes that failure reasonable under the circumstances so as to defeat

summary judgment on that condition precedent to coverage; (3) the shooting incident does not

fall within the scope of coverage of the homeowners policy because Mrs. Foster's death was not

"bodily injury . . . resulting from an accident;" (4) alternatively, even if the incident fell within

the scope of coverage, the intentional injury exclusion would negate coverage because Mrs.

Foster's death resulted from willful acts that Mrs. Foster knew or should have known would

cause injury.  Because no coverage exists under either the automobile policy or the homeowner's

policy, Nationwide owes no duty to defend or indemnify Mrs. Henson in the Foster lawsuit.

Summary judgment for Nationwide will be entered by separate order filed contemporaneously

with this opinion.

DONE and ORDERED this 26th day of September, 2003.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

33